**This document has been electronically entered in the records of the United States Bankruptcy Court for the Southern District of Ohio.**

**IT IS SO ORDERED.**



Guy R. Humphrey
United States Bankruptcy Judge

**Dated: August 20, 2019**

---

### UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

| | |
|---|---|
| In re:   JOHN BLAINE STONER | Case No.   18-30213 |
| | Adv. No.   18-3022 |
| *Debtor* | |
| WILLIAM FANSLOW, | Judge Humphrey |
| | Chapter 7 |
| *Plaintiff* | |
| v. | |
| JOHN BLAINE STONER, | |
| *Defendant* | |

---

### Decision Denying Plaintiff's Motion for Summary Judgment

Creditor–plaintiff, William Fanslow, holds a claim against Blaine Builders, LLC in the amount of $138,000 stemming from a failed construction agreement.[1] Fanslow filed a complaint seeking to pierce the corporate veil in order to hold debtor–defendant, John Blaine Stoner, Blaine Builders' sole member, liable for Blaine Builders' debt as well as a determination that that debt is nondischargeable under 11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6). This decision is on Fanslow's motion seeking summary judgment on the issues of corporate veil piercing and nondischargeability under 11 U.S.C. § 523(a)(2)(A).[2] (Doc. 23). For the reasons stated below, the court finds that Fanslow has not sustained his burden on summary judgment.

## I.      Findings of Fact and Procedural Background

At all pertinent times, Stoner was the sole member of Blaine Builders, LLC, an Ohio limited liability corporation. In August 2017 Stoner and Fanslow communicated through email and text messages concerning the construction of a residence for Fanslow. Stoner wrote that Blaine Builders was currently working on "two houses and a huge project going in Plain city," and that "[b]usiness is growing!" (Pl. Ex. F. 1). Stoner's and Fanslow's communications culminated in a construction contract dated November 15, 2017 under which Blaine Builders was to construct a combined residence and garage for Fanslow for $250,000 (Pl. Exs. A & F). The contract called for construction to be completed by March 14, 2018, with liquidated damages to be assessed on a daily basis if the house was not completed by that date. (Pl. Ex. A). Fanslow made two payments to Blaine Builders totaling $138,000 towards the completion of the house. (Pl. Ex. B).

To help complete the project, Blaine Builders engaged Mathew P. Taylor as its foreman. There is some disagreement about whether Taylor was Blaine Builders' employee or an independent contractor. Before Fanslow's first payment, Stoner issued the first of two checks on Blaine Builders' account to Taylor to begin excavation and to lay the foundation.

---

[1] Fanslow has filed a proof of claim against Blaine Builders in its separate bankruptcy case. *In re Blaine Builders, LLC.*, Case No. 18-bk-30475.

[2] Fanslow did not seek summary judgment on his claims for nondischargeability under 11 U.S.C. § 523(a)(4) and (a)(6).

(Pl. Ex. D 23:18–21). Stoner also made a down payment to his construction supply company of $8,637, and purchased plans for the residence. (Doc. 26; Defendant Exhibit A; Stoner Affidavit ¶ 6). Some limited site preparation work began in November 2017. (Pl. Ex. E ¶ 12). By the middle of December, it became apparent that Taylor would not be completing the work Blaine Builders paid him to do. (Pl. Ex. E; text messages dated 12/18/2017). Fanslow and Blaine Builders continued to work with each other until early January 2018 at which point cooperation between the parties appears to have broken down. (Pl. Ex. E; text message dated 1/9/2018). The residence was not constructed and Fanslow has little to nothing to show for the funds he spent.

Stoner filed a Chapter 7 petition on January 24, 2018 and Blaine Builders filed its bankruptcy petition on February 21, 2018. (Pl. Exs. G and H). Stoner received his Chapter 7 discharge on June 14, 2018.

Fanslow seeks judgment against Stoner: a) holding Stoner personally liable for the debt owed by Blaine Builders to Fanslow through a corporate veil piercing theory; and b) declaring that debt nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6)[3] so that it remains Stoner's obligation despite his filing a bankruptcy and obtaining a discharge.

## II.  Analysis

### A.  Jurisdiction

This court has jurisdiction pursuant to 28 U.S.C. § 1334, this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (O), and this court has constitutional authority to enter a final judgment.

### B.  Summary Judgment Standard

Federal Rule of Civil Procedure 56(a), made applicable to adversary proceedings through Federal Rule of Bankruptcy Procedure 7056, sets forth the standard to address the

---

[3] Any reference to the "Code" or any reference to a "§" of a statute shall be to the Bankruptcy Code of 1978, as amended, 11 U.S.C. § 101–1532, unless otherwise noted.

parties' filings. It states, in part, that a court must grant summary judgment to the moving party if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. In order to prevail, the movant, if bearing the burden of persuasion at trial, must establish all elements of its claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 331 (1986). All inferences drawn from the underlying facts must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88 (1986).

### C.    Establishing Stoner's Liability for Blaine Builders' Debt by Piercing the Corporate Veil and Proving Nondischargeability

In order to ultimately prevail in this adversary proceeding, as plead, Fanslow must establish two things: first, he must establish that Stoner is personally liable for the debt owed to him by Blaine Builders through application of the corporate veil piercing doctrine; and second, he must establish that the debt meets one of the exceptions to dischargeability under § 523(a).

Stoner is not a party to Blaine Builders' contract with Fanslow. To hold Stoner in his capacity as Blaine's sole shareholder personally liable for Blaine's debt, Fanslow seeks to pierce the corporate veil. "The principle that shareholders, officers, and directors of a corporation are generally not liable for the debts of the corporation is ingrained in Ohio law." *Dombroski v. WellPoint, Inc.*, 895 N.E.2d 538, 542 (Ohio 2008) (citing Section 3, Article XIII, Ohio Constitution). Veil piercing allows individual shareholders of the corporation or entity to be held personally liable for the entity's misdeeds "when it would be unjust to allow the shareholders to hide behind the fiction of the corporate entity." *Belvedere Condominium Unit Owners' Ass'n v. R.E. Roark Cos.*, 617 N.E.2d 1075, 1085 (Ohio 1993). Courts will permit individual shareholder liability only if the shareholder is indistinguishable from or the "alter ego" of the corporation itself. "Piercing the corporate veil in this manner remains a 'rare exception,' to be applied only 'in the case of fraud or certain other exceptional circumstances.'" 895 N.E.2d 538, at 542–43 (quoting in part *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003)). The doctrine is not a cause of action, but rather is an equitable remedy available to creditors of the entity under very limited and rare facts when "maintaining the corporate form would work injustice

4

upon an innocent party." *Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 606 (6th Cir. 2005). *See also In re Cincom iOutsource, Inc.*, 398 B.R. 223, 232 (Bankr. S.D. Ohio 2008) ("[A]lter ego doctrine is not itself a cause of action, but rather it is the rare exception that offers a plaintiff standing to disregard the corporate form . . . .").

The standard for piercing the corporate veil in Ohio was set out in *Belvedere*:

> The corporate form may be disregarded and individual shareholders held liable for wrongs committed by the corporation when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

617 N.E.2d at 1077 (syllabus ¶ 3). The *Belvedere* test was modified by the Ohio Supreme Court in *Dombroski*, which clarified that the second prong is not satisfied by conduct that is merely inequitable, but requires a showing that "the defendant shareholder exercised control over the corporation in such a manner as to commit fraud, an illegal act, or a similarly unlawful act" and that "[c]ourts should apply this limited expansion cautiously toward the goal of piercing the corporate veil only in instances of extreme shareholder misconduct." 895 N.E.2d at 540, 545.

In *Carter-Jones Lumber Co. v. LTV Steel Co.*, the Sixth Circuit reviewed cases applying Ohio law and determined that "because of the equitable nature of the veil-piercing doctrine, no list of factors can be exclusive or exhaustive." 237 F.3d 745, 749 (6th Cir. 2001). In rejecting a mechanical application of the factors set forth in *Belvedere*, the court stated:

> Denune's argument, if we adopted it, would straightjacket the courts in situations where equity demands that the fiction of corporate personhood be ignored. Consider, for example, a case in which a corporation with a single shareholder kept immaculate corporate records, observed all the formalities required by corporate law, and was adequately capitalized. The shareholder never commingled funds, and never held himself out as personally liable for the corporation's debts. The corporation even does some legitimate business. Can it be that the shareholder is immunized from personal liability if he causes the corporation to commit an illegal act, no matter the degree of his control over the corporation with regard to the illegal act, no matter the harm to third

parties, and no matter the other equities? Neither we nor the Ohio courts hold
that such immunity exists.

*id.* The Sixth Circuit re-emphasized that point in a later decision. *Taylor Steel, Inc. v. Keeton*, 417
F.3d 598, 606 (6th Cir. 2005) (Because veil piercing is an equitable remedy under Ohio law, it
is not necessary to establish "a set list of factors," but rather, it is available when "maintaining
the corporate form would work injustice upon an innocent party.").

Assuming that Fanslow can establish grounds for imposing personal liability on Stoner
through the veil-piercing doctrine, he must also establish that the debt is nondischargeable
under one of the exceptions to discharge. Fanslow plead that the exceptions provided by
§ 523(a)(2)(A), (a)(4), and (a)(6) are applicable, but has only sought summary judgment under
the § 523(a)(2)(A) exception. That provision provides, in pertinent part, as follows:

> (a) A discharge under section 727 ... of this title does not discharge an
> individual debtor from any debt—
>
> * * * *
>
> (2) for money, property, services, or an extension, renewal, or refinancing of
> credit, to the extent obtained by—
>
>> (A) false pretenses, a false representation, or actual fraud, other than a
>> statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A).

At trial, Fanslow would have the burden to establish grounds for piercing the
corporate veil under Ohio law, and would also have the burden to establish the grounds for
determining the debt to be nondischargeable under § 523(a)(2)(A). *See Taylor Steel*, 417 F.3d
at 607 (burden on plaintiff to demonstrate an alter ego remedy is appropriate) and *Grogan v.
Garner*, 498 U.S. 279, 291 (1991) (burden of proof for dischargeability is upon the creditor by a
preponderance of the evidence). As such, on summary judgment, he must establish all of
these requirements, with all inferences drawn from the underlying facts viewed in a light most
favorable to Stoner. *Celotex*, 477 U.S. at 331 (1986); *Matsushita*, 475 U.S. at 587–88.

6

### D.   Material Questions of Fact Exist as to Whether Fanslow Is Entitled to Pierce the Corporate Veil

#### 1.   Fanslow Has Not Established that Stoner's Control Over Blaine Builders Was So Complete That the Entity Had No Separate Mind, Will, or Existence of Its Own

Stoner is the sole shareholder of Blaine Builders. The mere fact that an LLC has a single member is insufficient to prove that a corporation has a separate mind, will or existence of its own because "[a] corporation is a separate legal entity from its shareholder even where there is only one shareholder in the corporation." *State ex rel. DeWine v. S & R Recycling, Inc.*, 961 N.E.2d 1153, 1159 (Ohio Ct. App. 2011) (citation omitted). No specific set of factors controls. *Taylor Steel,* 417 F.3d at 606. Nevertheless, here are some factors that Ohio courts use to determine whether the control prong has been met:

> (1) grossly inadequate capitalization, (2) failure to observe corporate formalities, (3) insolvency of the debtor corporation at the time the debt is incurred, (4) shareholders holding themselves out as personally liable for certain corporate obligations, (5) diversion of funds or other property of the company property for personal use, (6) absence of corporate records, and (7) the fact that the corporation was a mere facade for the operations of the dominant shareholder(s).

*LeRoux's Billyle Supper Club v. Ma,* 602 N.E.2d 685, 689 (Ohio Ct. App. 1991) (citing *P.K. Lumber Co. v. Robbins*, App. No. 12355, 1991 WL 15966 (Ohio Ct. App. Feb. 7, 1991)). While these factors are helpful in deciding the first prong . . . a court should focus on principles of equity and whether the relationship is so dominating that respecting it would be unjust." *Corrigan v. U.S. Steel Corp.,* 478 F.3d 718, 724–25 (6th Cir. 2007) (citing *Danziger v. Luse,* 815 N.E.2d 658, 662, 667 (Ohio 2004). Crucially, *Belvedere* described the first prong of its test as requiring a showing "that the individual and the corporation are fundamentally indistinguishable." 617 N.E.2d at 1086. The court will analyze these factors, as presented through the summary judgment filings, with certain related factors discussed together.

**Fanslow has not established that Blaine Builders was grossly undercapitalized or was insolvent when it entered into the contract.** Fanslow points to Blaine Builders' bankruptcy schedules listing $694,546.74 of debt and only $21,104 in assets as evidence that the LLC was

grossly undercapitalized (Pl. Ex. H 6). The bankruptcy, however, was filed four months after the conduct in question. Stoner has submitted evidence that his financial condition may have been better at the time Blaine Builders and Fanslow entered into the construction contract, including evidence that Taylor may have misappropriated money. (Stoner Affidavit ¶ 12).

Moreover, in cases in which business entities were found to be grossly undercapitalized, shareholders have purposely drained the corporation of assets as a shield to liability. *See e.g. Quality Interiors, Inc. v. Am. Mgmt. & Dev. Corp.,* No. 89-T-4303, 1990 WL 199248, at *5 (Ohio Ct. App. Dec. 7, 1990) (corporation had no capital of its own, parent company held all funds used to finance its operation); *Laborers' Pension Tr. Fund v. Sidney Weinberger Homes, Inc.,* 872 F.2d 702, 705 (6th Cir. 1988) (sole shareholder withdrew money for own benefit leaving creditors unpaid). No evidence has been presented that Blaine Builders' undercapitalization was intended as a shield to liability.

Finally, in *Taylor Steel*, the Sixth Circuit, applying *Belvedere*, found that the subject corporation was not inadequately capitalized despite $15,000 in debt and less than $500 in its corporate account. 417 F.3d at 605. Its reasoning was that because the corporation was a steel brokerage operating on cash flow, it only incurred a debt when a customer placed an order, and so as long as customers paid, it should have been capable of paying off its debts. Blaine Builders' debts consist mostly of construction obligations under construction contracts owed to customers and vendors for construction materials, which, like the steel purchases in *Taylor Steel*, would have been incurred as contracts were entered into and as materials for those contracts were purchased, with corresponding payments from the customers to fund those purchases. Thus, based on the evidence submitted thus far and making all inferences in favor of the non-moving party, it appears that the undercapitalization is the result of misfortune and mismanagement rather than misuse of the corporate form.

Fanslow also argues that Blaine Builders was insolvent at the time that it entered into the contract. He points to the evidence garnered as to the trouble which Blaine Builders had with meeting its financial requirements under its other construction projects underway at the time. However, Stoner asserts that Blaine Builders would have been able to complete Fanslow's contract but for Matthew Taylor's misappropriation of funds intended for use on

8

Fanslow's project. (Stoner Affidavit ¶ 7). Thus, Blaine Builders' insolvency at the time that the Fanslow contract was entered into is a question of fact which must be resolved at the trial.

**Fanslow has not established that Stoner and Blaine Builders failed to observe corporate formalities and maintain corporate records.** Fanslow argued that Stoner disregarded corporate formalities by taking a fulltime job and therefore was no longer able to provide proper oversite to his business (Pl. Ex. D 26, 38–39); by writing a check on account of Fanslow's project before Fanslow deposited a down payment (Pl. Ex. D 41); and by negligently hiring Taylor. (Pl. Exs. C, D 57–58). At most, these facts point to violations of the fiduciary duty of care that Stoner owed to Blaine Builders, or in other words, this evidence tends to show that Stoner exerted too little control over Blaine Builders, rather than dominating it.

On the other hand, Fanslow has pointed to evidence that Stoner failed to observe corporate formalities through his sloppy accounting and record keeping. (Pl. Ex. D 11–12, 19, 41, 45–46, 51, 62, 69). This concern weighs in favor of finding that Stoner failed to observe corporate formalities. However, sloppy accounting and record keeping is a wide-spread occurrence among small business entities, and as discussed, the corporate veil should only be pierced "in instances of extreme shareholder misconduct," *Dombroski*, 895 N.E.2d at 545.

Fanslow also points to evidence that Stoner used $10,000 in corporate funds to pay for his personal bankruptcy. (Pl. Ex. D 34–35). However, both Blaine Builders and Stoner are represented by the same counsel, so it is unclear from the evidence cited the extent to which this payment was a failure to observe corporate formalities.

**Fanslow has not presented evidence that Stoner held himself out as personally liable for Blaine Builder's obligations.** There is no summary judgment evidence that Stoner held himself out as personally liable for Blaine Builders' obligations. Stoner was not a party to the building contract and Fanslow's checks were made payable to Blaine Builders.

**Fanslow has not established that Stoner diverted funds or other property of Blaine Builders for his personal use or that Blaine Builders was a mere façade for Stoner's operations.** To support his claim that Blaine Builders was merely a façade for Stoner acting in his individual capacity, Fanslow points to the purchase of a BMW with Blaine Builders' funds,

yet titled to Stoner's wife (Pl. Ex. D 73); the use of Blaine Builders' funds to pay for Stoner's personal bankruptcy (Pl. Ex. D 34–36); and the comingling of corporate and personal funds. (Ex. D 61). In response, Stoner cited evidence indicating that the $3,300 used to purchase the BMW was repaid to Blaine Builders (Stoner Affidavit ¶ 5); and that Blaine Builders at all times existed as a separate legal entity with its own checking account. (Stoner Affidavit ¶ 3).

Stoner did not specifically refute Fanslow's claims that personal and corporate funds were comingled; however, the excerpt of Stoner's deposition transcript cited by Fanslow does not provide much support for this contention:

> Q. But you said though that you did take a draw from time to time?
>
> A. Yes.
>
> Q. And what was the purpose of the draw?
>
> A. Usually to compensate for money that I had put in personally.
>
> Q. When your corporate – ordinarily if you made a loan to your corporate books, they would show a loan. Would your corporate books indicate loans were made?
>
> A. Yes. Where I put money in from my personal account, yes.
>
> Q. And what would that show up on? What ledger would that show up on?
>
> A. Just my bank ledger, my statement. I'd have to go back through, my statements.

(Pl. Ex. D 61). This excerpt generally supports the proposition that Stoner took draws for his services to repay himself for capital contributions he made to the business. Arguably it supports the contention that Blaine Builders' bookkeeping was deficient. However, given Stoner's and Blaine Builders' separate bank accounts, it does not by itself support a contention that their funds were comingled.

In total, the evidence cited is not sufficient to support a finding on summary judgment that Stoner and Blaine Builders "are fundamentally indistinguishable."

2. <u>Material Issues of Fact Exist as to Whether Stoner
Exercised Control over Blaine to Commit Fraud or an
Illegal or Unlawful Act</u>

If Fanslow can demonstrate that Blaine Builders was the alter ego of Stoner, he must then show that this control was exercised to commit fraud, an illegal act, or a similarly unlawful act against Fanslow. When the *Dombroski* Court expanded the second prong to include "similarly unlawful act", it explained that "[c]ourts should apply this limited expansion cautiously toward the goal of piercing the corporate veil only in instances of extreme shareholder misconduct." *Dombroski,* 895 N.E.2d at 545. Fanslow argues that Stoner and Blaine Builders committed illegal acts under three different theories: 1) violations of the Ohio Home Construction Service Law ("HCSL"), Ohio Revised Code ("ORC") § 4722.01 et seq., which regulates home construction service suppliers; 2) the Ohio Fraudulent Transfers Act, ORC § 1336.01 et seq. and 3) § 523(a)(2)(A).

i.   *Ohio Home Construction Service Law*

ORC § 4722.03(A) prohibits construction service providers from engaging in certain prohibited acts, including the following sections that Fanslow argues Blaine Builders violated:

(1) Prior to commencing work related to the home construction service, fail to enter into a written contract that complies with this chapter;

* * * *

(3) After entering into a contract with an owner, do any of the following:

* * * *

(d) Fail to perform the home construction service in a workmanlike manner;

* * * *

(f) Fail to provide a full refund within a reasonable time period for any goods or services that the home construction service supplier has failed to deliver in accordance with the terms and conditions of the contract required by section 4722.02 of the Revised Code and for which the supplier has received payment;

(g) Fail to provide to the owner, within a reasonable time and upon the owner's request, a written, itemized receipt for any item of goods that is left with, or turned over to, the home construction service supplier for repair or services. . . .

\* \* \* \*

(8) Intentionally misrepresent any aspect of the transaction or the nature or the quality of the work or materials[.]

Ohio Rev. Code § 4722.03(A).

Section 4722.03(A)(1) prohibits work done without a contract which complies with ORC § 4722.02. Fanslow argues that Blaine Builders violated the statute by failing to include Blaine Builders' telephone number, tax ID number, costs not covered by the contract, and a copy of Blaine Builders' certificate of insurance. While the contract appears to violate these provisions, these violations do not rise to the level of an "instance[] of extreme shareholder misconduct" as contemplated by *Dombroski*. 895 N.E.2d at 545. Even if this was extreme misconduct, Fanslow made no argument that his damages stem from any of these contract deficiencies.

ORC § 4722.03(A)(3) prohibits contractors from failing to perform the construction in a workmanlike manner, failing to provide a refund, or failing to provide a receipt. One Ohio appellate court has recently ruled that a trial court finding that violations of § 4722(A)(3)(d), which concerns the failure to perform a "home construction service in a workmanlike manner," were illegal acts under *Dombroski* was not reversible error. *Denny v. Breawick*, LLC, __N.E. 3d __, No. 5-18-12, 2019 WL 2266690 (Ohio Ct. App. May 28, 2019). The Ohio Court of Appeals stated:

> Under *Dombroski*, a trial court must find that "fraud, an illegal act, or an unlawful act" occurred in order to pierce the corporate veil. *Dombroski* at ¶ 2. While the trial court found that the defendants did not commit fraud, the trial court did determine that Hunsaker violated two provisions of the HCSL and found that these "illegal acts" were "so egregious as to satisfy the standard set forth in *Dombroski*." Doc. 100. Thus, the trial court did not merely find that Hunsaker engaged in "unjust or inequitable" conduct but determined that Hunsaker committed two "illegal acts." *Dombroski* at ¶ 13. Further, in the absence of further guidance from the Supreme Court of Ohio, we find no reason to displace the trial court's finding that these "illegal acts," under the facts of this specific case, constituted the "egregious acts" that the doctrine of piercing the corporate veil exists to remedy. *Id.* at ¶ 18.

*Id* at *6. With this guidance, this court concludes that a violation of the HCSL may constitute an "illegal act" sufficient to pierce the corporate veil, but whether any such act is sufficiently egregious to meet the *Dombroski* standard is a question of fact.

Fanslow stresses Blaine Builders' and Stoner's failure to refund the $138,000 which Fanslow paid to Blaine Builders for the construction and Stoner's failure to be forthcoming with Fanslow as to the use of those funds to pay for work and materials on other construction projects. At a minimum, the summary judgment evidence shows a violation of ORC § 4722.03(A)(3)(f) with respect to Blaine Builders' failure to refund the money it received from Fanslow after it failed to provide the services required by the contract. The evidence also shows that the $138,000 was in large part dissipated through $48,000 being paid to Taylor for the project under questionable circumstances, including knowledge of Taylor's contemporaneous imprisonment, and significant other funds being used on other projects which were running short on cash. This violation of the HCSL caused Fanslow's damages because he would not be out-of-pocket these funds had Blaine Builders complied with the requirement of ORC § 4722.03(A)(3)(f). However, given the equitable nature of the veil-piercing remedy and drawing all inferences from the underlying facts in a light most favorable to Stoner, this court cannot conclude that this violation of the HCSL meets the egregious standard under *Dombroski.* At the trial, the court will be able to assess the witnesses' credibility, Stoner's state of mind at the relevant time, and all of the surrounding circumstances.[4]

Fanslow also asserts a veil piercing violation of ORC § 4722.04. That section provides that "[a] home construction service supplier may take as a down payment not more than ten per cent of the contract price before the supplier's performance that is required by the contract begins." Ohio Rev. Code § 4722.04. Fanslow argues that the $130,000 payment was a down payment paid before the construction work was commenced, but offers only conclusory statements to support the argument. There is no caselaw interpreting this

---

[4] Fanslow also asserts that the corporate veil should be pierced because Blaine Builders violated Ohio Home Construction Service Law which prohibits contracts from "[i]ntentionally misrepresent[ing] any aspect of the transaction or the nature or the quality of the work or materials." Ohio Rev. Code § 4722.03(A)(8). This argument is addressed later in this decision.

provision. The $130,000 check is dated November 16th. (Pl. Ex. B). The contract required Blaine Builders to begin performance on November 16th. (Pl. Ex. A 1). The summary judgment evidence is not sufficient to establish that the $130,000 was paid before the work was commenced. The only evidence presented on this issue appears to show that Blaine Builders began performance before receiving the $130,000. See Ex. D 41. For that reason, the court cannot grant summary judgment in favor of Fanslow as to this asserted illegal act being sufficiently egregious under *Dombroski.*

ii.  *Claims under the Ohio Uniform Fraudulent Transfer Act*

The Uniform Fraudulent Transfer Act deems transfers made, or obligations incurred by a debtor to be fraudulent as to a creditor under two separate theories, actual intent and constructive intent. It is unclear which of these theories Fanslow is pursuing; however, the court, liberally construing the legal arguments in the summary judgment motion, will consider both theories.

Under the actual intent theory, the creditor must show that the debtor made the transfer with the actual intent to hinder, delay, or defraud a creditor. Fanslow alleges four potentially fraudulent transfers made by Blaine Builders: 1) $48,000 to Mathew Taylor; 2) $3,300 for a BMW for Stoner's wife; 3) $41,800 used on other projects; and 4) $10,000 for the payment of bankruptcy legal counsel for Stoner and Blaine Builders. Fanslow argues that the transfer made to Taylor was made negligently, and therefore the court will not consider that transfer under the actual intent theory. While Blaine Builders became insolvent shortly after making all three remaining transfers, that fact alone is not sufficient to prove actual intent to defraud. The Fraudulent Transfer Act contains a non-exclusive list of factors that may be considered to determine whether a transfer was made with actual intent to defraud, including:

(1) Whether the transfer or obligation was to an insider;

* * * *

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

14

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred[.]

Ohio Rev. Code § 1336.04(B). Of the transfers alleged to have been made with actual intent, the $3,300 BMW was the only transfer to an insider, and the only one alleged to be made without consideration. However, Stoner has submitted evidence that the $3,300 was returned to Blaine Builders. (Stoner Affidavit ¶ 5). Overall, the evidence shows a material question of fact as to whether Stoner had the actual intent to defraud his creditors.

Under the constructive intent theory, creditors need not show that a transfer was made with the actual intent to defraud creditors, if they can show that the transfer was made "[w]ithout receiving a reasonably equivalent value in exchange" and if either:

(a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;

(b) The debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Ohio Rev. Code § 1336.04(B)(2).

Turning back to the four alleged fraudulent transfers, Stoner has submitted evidence that Blaine received value for the $3,300 BMW, and evidence does not prove that Blaine did not receive value for the $41,800 it spent on other projects, or the $10,000 retainer paid to counsel. Fanslow argues that Blaine received no benefit from the $48,000 transfer to Taylor. Courts have found that enforceable contract rights to future consideration can provide reasonably equivalent value. *Slone v. Lassiter* (*In re Grove-Merritt*), 406 B.R. 778, 806 (Bankr. S.D. Ohio 2009). This is particularly true when "the debtor receives part performance contemporaneously with payment." *Frank v. Kiesel* (*In re Denison*), 292 B.R. 150, 156 (E.D. Mich. 2003). In exchange for its transfer to Taylor, Blaine Builders received an agreement for Taylor to provide his services for excavation and foundation work on the site, and to provide gravel. Moreover, the gravel was actually delivered and the foundation work was begun. For these reasons, Fanslow has not established that the transfers made without consideration.

### iii.  *Exception to Discharge for Debts Obtained Through Fraud*

Code § 523(a)(2)(A) provides that money obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition" is not subject to the discharge. This section does not describe an act, but rather, states that a debt incurred as a result of false pretenses, a false representation, or actual fraud is nondischargeable under the Code. Fanslow does not cite any authority, and the court is unaware of any authority, that proving a § 523(a)(2)(A) claim can be used as the basis for finding an illegal or unlawful act to pierce the corporate veil.

Nevertheless, the elements to prove nondischargeability as a result of a false representation under § 523(a)(2)(A) closely mirror those required for a finding of common law fraud under Ohio law. *Schafer v. Rapp (In re Rapp)*, 375 B.R. 421, 435 (Bankr. S.D. Ohio 2007). Accordingly, the court will liberally construe Fanslow's argument as being that Stoner committed an illegal or unlawful act under *Dombroski* through false pretenses, a false representation, or actual fraud under Ohio common law. The elements of common law fraud are:

(a) a representation or, where there is a duty to disclose, concealment of a fact,

(b) which is material to the transaction at hand,

(c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

(d) with the intent of misleading another into relying upon it,

(e) justifiable reliance upon the representation or concealment, and

(f) a resulting injury proximately caused by the reliance.

*Burr v. Board of Cty. Comm'rs*, 491 N.E.2d 1101, 1102 (syllabus ¶ 2) (Ohio 1986). For the most part, Fanslow's motion for summary judgment does not quote specific misrepresentations by Stoner. Rather, Fanslow has provided page ranges which the court assumes contain what Fanslow views as misrepresentations.

Fanslow first argues that he was not informed that a portion of the money that he paid towards the construction contract would be used for other projects. However, omissions only meet the first element of common law fraud "where there is a duty to disclose," and Fanslow

16

has not provided legal authority establishing that Blaine Builders was under a duty to disclose that his funds would be used on other projects.

Second, Fanslow argues that Stoner held himself and his company out as being capable of building large homes. Stoner wrote in an email dated October 25, 2017 "[w]e have two houses and a huge project going in Plain City right now, but we believe we can get you under roof this fall." (Pl. Ex. E 1). Fanslow cites no evidence suggesting that this statement is false. Fanslow further argues that Stoner lied about the success of current projects. In support of this contention, Fanslow quotes the following statements: "[t]hese are exciting times for us. Business is growing!" (Pl. Ex. E 1); "We have many options like that. We have solar too." (Pl. Ex. F. text dated 9/5/2017 6:37:20 PM); "Home Office can probably draw up some plans. Our Architect is not as expensive as regular architect and he's faster." (Pl. Ex. F text dated 9/5/2012 6:41:17 PM). Again, Fanslow cites no evidence suggesting that any of these statements are false. Further, these statements appear more in the nature of sales puffery, rather than fraudulent misrepresentations. As this court found in *FT Express v. Conley* (*In re Conley*), 2012 Bankr. LEXIS 4788, at *45–46 (Bankr. S.D. Ohio Oct. 5, 2012):

> To warrant a finding of nondischargeability, the representation must be one of existing fact and not merely an expression of opinion, expectation, or declaration of intention. *Smith v. Meyers* (*In re Schwartz & Meyers*), 130 B.R. 416, 423 (Bankr. S.D.N.Y. 1991); *Bucl v. Hampton* (*In re Hampton*), 2008 Bankr. LEXIS 1943, at *21–22 (Bankr. D. Kan. June 27, 2008), aff'd 2009 Bankr. Lexis 427, 407 B.R. 443 (B.A.P. 10th Cir. March 11, 2009) [*46] (table decision). Statements "which amount to no more than sales 'puffery' upon which reliance should not be placed" cannot serve as the basis for a finding of nondischargeability. *Hampton* at *22. *See also Stahl v. Lang*, 108 B.R. 586, 589 (Bankr. N.D. Ohio 1989) (representation that investments in limited partnerships were risk-free was in the nature of "puffery").

These quotes seem much more in the nature of sales puffery rather than actionable misrepresentations.

Fanslow also references a large swath of text messages between he and Stoner in the two months leading up to the signing of the contract. After review, only one statement seems relevant. Fanslow wrote that one of Stoner's references indicated that her project was running late. Stoner responded:

> The building inspector there has been giving us fits. The plain city project
> is running way behind. It's been somewhat county a persons working in. [sic]
> We ended up with a permit in Champaign County in for days, In Union County it
> took eight weeks.
>
> The inspector in Logan County keeps changing his mind about what he
> wants.

(Pl. Ex. F; texts dated 11/9/2017 at 3:33 PM). Again, no evidence has been given that these statements are false. Further, on their face, these statements undercut Fanslow's argument that Stoner misrepresented the status of his current projects and his experience.

Finally, Fanslow argues that Stoner represented to him that in exchange for $250,000, he would build Fanslow a home. If Stoner made this statement knowing it was false, it would be fraudulent, enabling Fanslow to pierce the corporate veil, and would render the debt nondischargeable as well. The evidence Fanslow has cited thus far is that: 1) within four months of contracting with Fanslow, Blaine Builders was insolvent; 2) the initial payment to Blaine Builders was large in relation to the initial work to be done on the project; and 3) Stoner used some of the funds received from Fanslow on other projects which were beginning to falter. On the other hand, there is evidence suggesting that Stoner did intend to fulfill Blaine Builders' responsibilities on the project, including 1) paying $20,000 to Taylor before receiving payment from Fanslow, and 2) paying a total of $58,200 towards the project in its early days. Thus, whether Stoner intended to complete Fanslow's home at the time of the contract is a material question of fact which can only be determined through a trial.

### E.    The Summary Judgment Evidence Does Not Establish That Blaine Builders' Debt to Fanslow Is Nondischargeable as a Debt Obtained by Fraud

While Fanslow argues that his summary judgment evidence establishes that Stoner is personally liable for Blaine Builders' debt under the veil piercing doctrine, he at the same time argues that the same evidence establishes that the debt is nondischargeable under § 523(a)(2)(A), which excepts from the discharge, debts obtained through "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an

insider's financial condition."[5] To establish that a debt is nondischargeable, a creditor must show that:

> (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

*Rembert v. AT&T Universal Card Servs.* (*In re Rembert*), 141 F.3d 277, 280–81 (6th Cir. 1998) (footnote omitted). This standard would likely be met if Fanslow establishes common law fraud. *See Rapp*, 375 B.R. at 435.

Additionally, the Supreme Court has held that, for the purposes of § 523(a)(2)(A), "[t]he term 'actual fraud' . . . encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation." *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016). If Fanslow can show that Stoner engaged in some form of fraudulent misrepresentation or actual fraud in the creation of the debt to Fanslow, the debt would be nondischargeable. However, for all of the reasons discussed, the evidence is not sufficient to render summary judgment as to Fanslow as to either the veil piercing theory or as to the nondischargeability of the debt.

## III. Conclusion

In summary, given the equitable nature of the veil-piercing doctrine, and drawing all inferences from the underlying facts in a light most favorable to Stoner, this court cannot conclude from the summary judgment evidence that Stoner's conduct involved in the creation

---

[5] Several of the statements in question relate to the debtor's financial condition, and thus cannot be considered under § 523(a)(2)(A). Section 523(a)(2)(B) allows such statements to be considered, so long as they are made in writing. While all statements relating to the debtor's financial condition were made in writing, Fanslow did not plead nondischargeability under § 523(a)(2)(B), thus there is a question of law on whether Fanslow may depend on such statements to prove nondischargeability. *Cf. First Nat'l Bank v. Pontow*, 111 F.3d 604, 608 (8th Cir.1997) (quoting *Barclays Am./Bus. Credit, Inc. v. Long* (*In re Long*), 774 F.2d 875, 877 n. 1 (8th Cir. 1985)). ("Since subsection (B) [of § 523(a)(2)] covers only statements 'respecting a debtor's . . . financial condition' and subsection (A) excludes such statements, the subdivisions 'are . . . expressly mutually exclusive.'")

of the debt between Blaine Builders and Fanslow meets the egregious standard under *Dombroski*. Accordingly, Fanslow's summary judgment motion is denied.

Copies to:

Roger E. Luring , electronically served
     (Counsel for the Plaintiff)

Samuel J. Petroff, electronically served
     (Counsel for the Defendant)